1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

LOUIS MARK CHAOUSIS, a married man
in his individual capacity,

                        Plaintiff,

            v.

PIERCE COUNTY, a governmental entity,

                        Defendant.

**Case No.** C04-2445 JKA

**FINDINGS OF FACT**
**and**
**CONCLUSIONS OF LAW**

THIS MATTER, originally filed in the King County Superior Court for the State of Washington, was removed by the defendant to the United States District Court for the Western District of Washington pursuant to 28 U.S.C.§ 1441.  Plaintiff Complaint seeks relief pursuant to three causes of action:

> First Cause of Action – alleges a violation of public policy through an adverse employment action in violation of plaintiff's rights under the Family Medical Leave Act (FMLA),  29 U.S.C.§ 2615, and the Washington State counterpart found at RCW 49.78.010.

> Second Cause of Action – alleges an FMLA violation of plaintiff's rights under 29 U.S.C.§ 2617(2), and RCW 49.78.010.

> Third Cause of Action – alleges Breach of Implied Contract.

Jurisdiction is vested in this court pursuant to 28 U.S.C.§ 1331.  The court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C.§ 1367(a).  Accordingly the court has jurisdiction over the subject matter and parties to this  action.

The matter was tried to the court January 30 thru February 2, 2006.  The plaintiff, Louis Mark Chaousis, was personally present with counsel Brian L. Dolman.  The defendant, Pierce County, appeared with Information Services Department Director, Terry Hale, and with counsel, Bertha Fitzer and Donna

Masumoto. The court considered the statements and arguments of counsel, carefully reviewed the testimony of the witnesses and all exhibits admitted into evidence, and enters the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

1. Plaintiff, Chaousis, was employed as a programmer by defendant, Pierce County continuously from 1986 through August 29, 2003, in the Information Services Department (ISD). He was salaried at the level of an Information Technology Specialist (ITS) 2. He was an FLSA salary exempt employee. There is no history of disciplinary issues. As an ISD employee, defendant and his team provided programming services to the many county agencies and departments, hereinafter referred to as "customers" or "users."

2. Terry Hale is the Director of the ISD. Next in the chain of command are four Division Managers. The Division Manager for plaintiff was Wallace Emmons. Below the division managers are Team Leads. From early 2000 to June of 2002, the Team Lead for plaintiff was Neil Blindheim. Plaintiff and his team lead enjoyed a good relationship which included playing racquetball outside the workplace.

3. Defendant, Pierce County, engages in Performance Reviews of its employees. These reviews are supposed to take place annually, but that does not regularly occur. Because of the vast number of county employees, those who are eligible for promotion or pay increases receive priority in receiving performance reviews.

4. Throughout the period of his employment plaintiff's performance reviews showed greater strength in the areas of his technical skills and lesser performance in those areas described as "soft" skills, including, but not limited to, customer relations, attitude, team work, and professionalism. None of these issues were related to issues of attendance.

5. Pierce County has a very liberal sick leave policy, independent of the FMLA. The Human Resources Department incorporates the FMLA into its sick leave benefit and encourages employees to receive its qualifying benefits both with regard to the employee and his/her family members.

6. As an FLSA salary exempt employee, plaintiff had the flexibility to schedule medical

appointments and personal matters during the day so long as these activities did not interfere with his work performance.  Medical appointments and other short term absences were not charged against employees sick or vacation time so long as they reported for work for at least a portion of the day.  If an employee was on Family Medical Leave, however, the time was charged against the employees sick leave time for whatever portion of the day the appointment required the employee to be absent.  Additionally, (with team lead approval) team members were allowed informal "flex time," "comp time" and "telecommuting" arrangements.  Employees were expected to work 40 hours per week.  They worked on an "honor" system under which time taken off for medical appointments and personal matters was presumably made up by time worked outside their regularly scheduled work hours (evenings and weekends) as necessarily required to meet the customers needs, unless, as stated above, the employee was on Family Medical Leave.

Each member of plaintiff's team was assigned an 8 ½ weekday shift.  The daily shifts of team members overlapped, but did not necessarily begin or end at the same hour.  This allowed for broader hours of coverage for the customers. Telecommuting (working at home on laptop computers taken from the workplace) was allowed at the discretion of the team leader and manager.  There was no formalized system for tracking "flex time," "comp time," and "telecommuting time.

7.  In November of 1998, plaintiff suffered a serious medical illness requiring the removal of a cancerous kidney.  Upon learning of the situation the Human Resources Department prepared and approved without plaintiff's signature (because of plaintiff's hospitalization) Family Medical Leave time.  Shortly thereafter, the application and approval was amended to include plaintiff's signature.  Plaintiff made a full recovery and was released by his physician to return to work.  Thereafter, it does not appear from the record that plaintiff ever initiated a request for Family Medical Leave status,  nor does it appear it was ever again initiated by the Human Resources Department on his behalf.  It is Human Resources procedure to initiate an application for Family Medical Leave  when their records indicate three days of consecutive sick leave.

8.  In June of 2000, plaintiff married his present wife, Robyn, an Australian national.  Because they

met through the Internet,  the development of the relationship involved not only plaintiffs travel to

Australia, but more particularly her travel to the United States and attempts to secure the appropriate U.S.

residency status through immigration for herself and her son.  Plaintiff and his wife planned for him to

complete 20 years of service with Pierce County.  Thereafter, they planned to relocate permanently in

Australia. In the interim they sought a residence visa for Robyn while he completed his 20 years of service.

This required  effort by the plaintiff while in the United States, effort by Robyn while in Australia, and more

travel to Australia by the plaintiff.   The events of September 11, 2001 resulted in the closure of the U.S.

Embassy in Australia,  and the rescheduling of an appointment in Sydney Australia for which the plaintiff

had traveled to Australia.  It was an understandably frustrating time for plaintiff and his wife.  Plaintiff

made sick leave request for days consecutive to the end date of his vacation time for each of two separate

trips to Australia in 2001.  The plaintiff and his wife each resided in their own separate countries from

approximately June of 2000 until October of 2001.

　　　　　9.  In 2001, plaintiff's team lead, Neil Blindheim, became frustrated by plaintiff's absences from the

workplace, understanding them to be in part attributed to his working on his wife's immigration issues.

Mention of this concern to plaintiff affected the nature of their friendship and working relationship.

Blindheim began keeping records of the dates on which plaintiff left work early, and became concerned that

customers were being billed for a full days work on days when plaintiff had not been in the work place a

full day.  Department employees are required to accurately record time worked on projects so that the costs

of performing those tasks can be charged  to the end user.  He also felt that plaintiff's absences affected the

ability of his team to work together.  Much of this strain is evidenced by emails between Blindheim and

plaintiff and emails between Blindheim and his superiors and Human Resources personnel.  These emails

have been admitted as exhibits and are a part of the record.  Blindheim began keeping a record of days that

plaintiff left work early.  Those records reflect Blindheim left early on 22 days in 2001 in addition to taking

eight to nine weeks of vacation and full sick days taken. This information was

forwarded by Blindheim to Emmons on January 29, 2002 (Defendant's Exhibit A2E PC444).  Blindheim

made it clear he would like plaintiff assigned to a different team (Defendant's Exhibit A2E PC 430, 435, 441).  Blindheim was also frustrated with insubordination issues regarding plaintiff's refusal to return the county computer, follow instructions, and be a team player.

10.  On January 14, 2002, plaintiff informed Neil Blindheim that he needed time away from work to take his wife to the doctor and that it was "serious," although he was not able to clearly articulate the nature of the problem.  At about the same time plaintiff advised Blindheim of his own need for dental work (root canal).  During that month plaintiff took sick leave on January 15, 17, 23, and 24.  On January 23, 2002 plaintiff advised Blindheim that his wife was "going to be fine."  Significantly plaintiff did not take sick leave three or more consecutive days in a row, which would have triggered the Human Services Department to inquire about Family Medical Leave,  and he initiated no request for Family Medical Leave.  E-mail responses from Neil Blindheim indicate no resistance to the leave requested, and in fact evidenced Blindheims  concern for the welfare of plaintiff's wife.

Although the  FMLA is intended to extend benefits to employees, the plaintiff being a salaried exempt employee would have gained nothing greater than the regular sick leave benefit authorized by the defendant, and would have lost the right to leave early, come in late, or take time off during the work day for a medical need without it being charged against his sick leave.  Medical efforts on behalf of plaintiff's wife in January of 2002 did not resolve the issue and she underwent a hysterectomy in June of 2002.  Plaintiff took one day of sick leave relative to this surgery.

11.  On  January 28, 2002, Neil Blindheim, Wallace Emmons, and Terry Hale met with representatives of the Human Resources Department to discuss ISD concerns regarding plaintiff's performance, attitude, and attendance issues.  The meeting concluded with the need to explore the appropriate action, i.e. a letter of expectations to plaintiff or a performance review.  Although a subsequent email from Martha Keogh of Human Resources suggested a letter of expectations, it appears ISD proceeded to initiate an Employee Performance Review.  Prior to instituting the performance review no

one discussed the issues directly with plaintiff, other than as evidenced in the emails with Blindheim.

12.  On January 29, 2002,  Blindheim emailed plaintiff regarding an issue of insubordination (leaving early contrary to instruction) and concerns that customers may been charged for time not worked by plaintiff.

13.  Plaintiff's team lead (Blindheim) and manager (Emmons) presented a proposed Employee Performance Evaluation to Human Resources for review on March 28, 2002.  Human Resources returned the proposed document with a request for greater specificity.  Although it covered the period March 2000 – March 2002, it was not finalized and signed until June 2002.  The review, *Plaintiff's Exhibit 1*, enumerates six performance categories in need of improvement: (a) Dependability; (b) Customer Service; (c) Communication Skills; (d) Professionalism; (e) Judgment, problem solving, and decision making; and (f) Ability to Work as a Member of a Team.  Under "Dependability" the review states:

> "Mark needs to improve his attendance in order to be more dependable to his team.  Mark keeps his sick leave accrual balance at near zero levels and often calls in sick during critical times when he is needed to complete work assignments.  This requires extra work for his team members and creates an unnecessarily high stress level."

There is no mention of attendance as a factor or sub-factor under the five other categories of concern, which are considered "soft" or non-technical performance issues.  Collectively these five categories concern communication skills and relationship issues between plaintiff and his team members and customers which affect the quality and timeliness of the teams work effort.  There is nothing in the performance review that specifically speaks to his wife's 2002 medical procedures both of which occurred well after Blindheim had made his concerns known to both the defendant and his superiors.  There is nothing in the performance review to suggest that the attendance comments were motivated by anything other than plaintiff's 2001 attendance issues, none of which appear to have any FML implications.  The emails between plaintiff and Blindheim during the January 2002 medical treatment for plaintiff's wife indicate no displeasure or criticism from Blindheim regarding plaintiff's absences related to his wife.  There is no evidence of criticism from Blindheim regarding the June 2002 hysterectomy.  There is no

evidence leading up to the performance review, during the performance review, or thereafter that indicates

it could lead to any discipline other than a single email authored by Department Manager Terry Hale making reference to a potential "reprimand," which did not occur.  Certainly, there is no evidence to suggest that anyone participating in the performance review saw termination or layoff as an ultimate consequence.   No witness testified that they had any evidence of misuse or abuse of sick leave by plaintiff, although Betsy Sawyers, Director of Human Resources testified that a pattern of sick days attached to weekends and vacations could trigger closer scrutiny.  At no time prior to this litigation did any representative of the defendant ask for any medical verification of sick leave.

14.   In June of 2002,  plaintiff, by way of agreement,  was transferred to the LINX team.  Plaintiff was told that the move was intended to allow him a "fresh start."  Plaintiff had reason to expect a new Employee Performance Review in either March or June of 2003 (the anniversary date of the Platintiff's Exhibit 1).  Plaintiff worked without notable incident on the LINX team until his layoff in August of 2003. No Employee Performance Review was conducted in 2003.

15.   Subsequent to plaintiff's June 2002 Employee Performance Review, ISD learned that they would be required to layoff two employees because of the budgetary impact of bringing online a new system for the Auditor/Assessor's Office.  The layoffs were scheduled to occur on or about September 1, 2003.   It appears undisputed, and the court so finds,  that the reduction in force was based on legitimate business needs of the employer.  Procedurally, ISD was to recommend to the Director of Human Resources which employees should be layed off in conjunction with the reduction in force.   After evaluating their needs, ISD made the recommendation to  lay off two persons at the level ITS2.  A skills and ability assessment was made with regard to the ITS2 employees.  The persons recommended for layoff were Kathy Ruhl and plaintiff Mark Chaousis.  Defendants Exhibit A-17(a) lists the Software Development ITS2 employees.  It reviews knowledge, skill, and abilities and includes comments on performance.  The handwritten notes in the right hand margin were entered by the  Human Resources Department when reviewing the recommendation.  Those notes indicate that only Ruhl and plaintiff

suffered performance issue comments in their most recent Employee Performance Reviews.  The

comments within Defendant's Exhibit A-17, (excluding attendance issues and the margin notes) standing alone substantiate the selection of plaintiff for layoff when compared to the commentary on other ITS2 employees.

16.  On June 17, 2003,  the Pierce County Personnel Department notified plaintiff in writing of his layoff to take effect August 29, 2003.  The letter advised plaintiff that, upon request, his name would be placed on a reemployment register for his current classification or any equal or lower classification for which he was qualified and for which he indicated an interest.  He was further advised that those persons whose names appeared on the reemployment register are referred for consideration before eligible persons from other employment registers.

17.  Pursuant to his appearance on the reemployment register plaintiff was notified of positions as they became available.  On August 18, 2003,  he was advised of an ITS2 position which would have provided uninterrupted employment  through the end of the 2003.  Though, not yet having reached the date of his layoff, he chose not to apply for that position.   Subsequent to the effective date of his layoff, plaintiff was advised of additional positions as they became available and was ultimately hired back into a temporary ITS2 position in January of 2004 which evolved into a permanent position which he has held to this date. He returned to work with all of his pay and benefits in effect as though he had no interruption in employment except for his medical benefit, which commenced anew because he had not opted for the COBRA benefit following his layoff.

18.  Plaintiff has continued his employment with Pierce County in the ISD as an ITS2 employee since his return to work (following layoff) in January of 2004.

## CONCLUSIONS OF LAW

### *State and Federal Family Medical Leave Acts / Violation of Public Policy*

1.  The Family Medical Leave Act has been addressed by the Ninth Circuit Court of Appeals in *Bachelder v. American West Airlines*, Inc., 259 F.3d 1112, (9th Cir. 2001), and *Liu v. Amway Corporation*,

347 F.3d 1125 (9th Cir.2003).

ORDER
Page - 8

2.    Insofar as it may be applicable to the case at bar, *Bachelder* stands for the propositions that (1) the *McDonnell Douglas* burden shifting analysis familiar from anti-discrimination law is inapplicable in determining whether an employer illegally used FMLA protected leave as a negative factor in its decision to terminate employee; (2) to prevail on a claim that employee was terminated for poor attendance, employee is only required to prove by a preponderance of the evidence that the taking of FMLA-protected leave constituted a negative factor in the decision to terminate her; and (3) in so determining,  the finder of fact may consider either direct or circumstantial evidence, or both.  In *Bachelde*r there appear to be both attendance and performance issues, however the attendance issues were obviously dominant.  The description of the performance issues are vague,  non-specific, and "on-time performance" appears to be connected to absenteeism.  Such is not the case in the case at bar.  Plaintiff has not proved by a preponderance of the evidence that the absences of concern to the defendant were FMLA qualified or that the defendant would have any reason to believe they were.  Plaintiff's claim based on a violation of his FMLA rights, or retaliation for the use of those rights must fail.  Likewise,  his claim based on a violation of public policy insofar as ignoring or denying those rights must fail.

3.    *Liu* involved a plaintiff employee with obvious Family Medical Leave rights in conjunction with the delivery of a child and maternity leave, whose employer outrageously interfered with her exercise of those rights by attempting to control and subordinate the duration of her maternity leave to operational interests.   There was not the slightest hint of any performance issues with regard to the employee.  The *Liu* court is instructive insofar as it makes clear that a reduction in force does not excuse the employer from meeting their obligations under the FMLA.  Although the case at bar is about a layoff resulting from a reduction in force, the defendant has never taken the position that this altered plaintiffs FMLA rights. Defendant was faced with a legitimate need to layoff two employees.  *Liu* also clarifies employees right to take up to 12 weeks of leave for qualifying medical reasons and to return to his or her original/equivalent position.  Inasmuch as the court has found that there is no showing of any FMLA qualified leave,  no right

has been violated.  Even if the court found sufficient evidence to qualify Robyn Chaousis's medical

condition in January through June of 2002 as FMLA qualified leave, defendant registered no concern about attendance of the plaintiff relating to the 2002 illness.  Further there is no evidence those earlier absences qualified as FMLA leave.  *Liu* clearly imposes upon the employer the duty to determine when leave under FMLA is appropriate, to inquire as to specific facts to make that determination, and to inform the employee of his or her entitlements.  In this case plaintiff had received qualified FMLA in 1997/98 relative to his cancer surgery.  He was aware of the entitlement.  His disclosures regarding his wife's medical condition in January and June of 2002 were not at all clear, and were peppered with suggestions that she was "fine".  It is also clear that plaintiff knew that so long as he didn't take FMLA leave, he wouldn't be charged for any time off against his sick leave under the defendants' regular (non FMLA) sick leave policy, so long as he put in an appearance during the day.  There do not appear to be three or more consecutive days off during any of the periods of illness attributed to Robyn Chaousis.  Defendant's uncontroverted testimony, which the court finds credible, is that they encourage proper care for their employees and dependents, and that plaintiff's time off to care for his wife was never a part of their attendance concerns.  Plaintiff's claim for relief pursuant to the Family Medical Leave Act fails inasmuch as plaintiff has failed to show that defendant interfered with any Family Medical Leave Act entitlement and/or failed to show that defendant retaliated against plaintiff for exercising any Family Medical Leave Act entitlement.  Assuming there was an FMLA entitlement there is no evidence that defendant wanted the entitlement, sought the entitlement, or that the entitlement in anyway was causally connected to his selection for layoff.

3.  Plaintiff's claim for relief based on violation of public policy fails inasmuch as it is predicated on defendant violating the Federal and State Family Medical Leave Act provisions..

### ***Breach of Implied Contract***

4.  Plaintiff asserts that the promise of a "fresh start" when he transferred to a different team supports a breach of implied contract not to be laid off.  Initially, the court finds no consideration for such

a promise.  Plaintiff did not have a right to be assigned to any particular team for any specific period of time.  There is no evidence he resisted or resented the transfer in any way.    Beyond that, to suggest that

the plaintiff could elevate himself above other similarly classified employees in a lay-off struggle by being given an opportunity to improve his performance issues would create an un-level playing field with his fellow employees.  In order to prevail, plaintiff would first have to establish a promise not to consider past behaviors for purposes of a reduction in force.  That has not been established.  Plaintiff's claim for breach of implied contract fails.

5.  Accordingly plaintiff's claims should be dismissed and judgment granted in favor of the defendant.


February 7,  2006

 /s/ J. Kelley Arnold
J. Kelley Arnold
United States Magistrate Judge

ORDER
Page - 11